## LAZARUS v. BARBER et al.

(Circuit Court of Appeals, Second Circuit. March 8, 1905.)

### No. 119.

1. SHIPPING—INJURY TO GOODS—CAUSE OF DAMAGE—EVIDENCE—REVIEW.

Where, on a libel for damage to cargo, the trial judge saw none of the witnesses and the controversy involved a sharp conflict of evidence on the issue of the cause of the damage, the entire record will be examined on appeal.

2. SAME—BURDEN OF PROOF.

Where the evidence shows that the damage to a cargo was occasioned by one of the causes for which the vessel was exempted from liability, in the absence of some fault, such as negligent stowage, the burden is on the libelant to show that it might have been prevented by reasonable skill and diligence on the part of the servants of the vessel.

3. SAME—EVIDENCE.

On a libel for damage to a shipment of green goatskins, evidence *held* to justify a finding that the injury was caused by brine leaking from citron barrels negligently stowed near the skins.

Appeal from the District Court of the United States for the Southern District of New York.

For opinion below, see 124 Fed. 1007.

This is an appeal from a final decree of the United States District Court for the Southern District of New York, in favor of libelant for cargo damage.

J. Parker Kirlin, for appellants.

Anson M. Beard, for appellee.

Before LACOMBE, TOWNSEND, and COXE, Circuit Judges.

TOWNSEND, Circuit Judge. The libelant is the assignee of bills of lading covering some 280 bales of goatskins, delivered to respondents' agents at Constantinople for shipment on the steamship Brand, chartered by respondents under a bill of lading which provided, inter alia, that the carrier—

"Shall not be liable for * * * * any loss or damage arising from the nature of the goods, * * * * nor for any loss or damage caused by * * * * decay, putrefaction, * * * * sweat, * * * * nor for any country damage."

The skins on arrival were found to be in a badly damaged condition. The libel alleged as the cause of said damage such negligent stowage in the hold of the vessel that the skins became wet—

"Either from the contact with water in the hold or from leakage through the decks, but in what precise way they took the water libelant cannot now say;

and they were farther more seriously damaged from the fact that they were negligently stowed in the hold under a large number of casks of citron, which for some reason became broken and badly leaked, and the fluid substance in the said casks dripped down upon the said skins in large quantities, and caused them to heat, sweat, sour, and rot, and rendering them unfit for market as prime goods."

The answer denied these allegations, and alleged that the damage "was caused by heat, sweat, or decay," within the exceptions of the bill of lading.

The goatskins in question are known as "salted skins," also spoken of herein as "green salted" or "dry salted" skins, as distinguished from dry or air cured or "flint dried" skins. They absorb moisture more readily than the latter class, and therefore reasonable care should be taken to stow them where they will be protected from dampness or from coming in contact with leakage from wet cargo. When loaded on board at Constantinople, "the general appearance was sweaty, like all salted hides," and they were receipted for as in good order and condition.

The facts as to stowage are as follows: In the bottom of hatches Nos. 3 and 4 were stowed manganese ore, covered with dunnage planks; on top of these planks were stowed 885 casks of pickled citron, extending from the after part of hatch No. 3 into the forward part of hatch No. 4. The skins were stowed in hatch No. 4, aft of the citron and next to it, and about six inches from the floor. There were no permanent bulkheads between the hatches, but between the barrels of citron and the skins was a temporary bulkhead, consisting of three inch planks placed up and down against the citron barrels and athwart-ship outside, a short distance apart, and leaving open spaces between, and aft of the bulkhead and next to the skins were some bamboo mats. The space between the barrels and skins was about six inches. No barrels of citron were stowed on or above the skins, and the bales of skins and the barrels were probably about on a level on top. Next aft of the skins in question was another shipment of bales of skins from Salonica, and next forward of the barrels of citron was another shipment of 200 bales of skins, neither of which was damaged. On top of the skins and citron were stored a quantity of bales of wool.

The court below found that the injury was due to the brine escaping from the citron barrels and its absorption by the skins, and that this was the result of the want of due care in the stowage of the skins. If this conclusion had been reached upon the testimony of witnesses before the court, we should be reluctant to disturb its finding upon this question of fact. But as the judge saw none of the witnesses, and as the controversy involves a sharp conflict of evidence, we have felt bound to examine the entire record, under the rule stated in The Frey, 106 Fed. 319, 45 C. C. A. 309.

Respondents base their appeal on the following contentions:

"(1) As the damage alleged in the libel is within the exceptions of the contract of carriage, and the exemption of the third section of the Harter act [Act Feb. 13, 1893, c. 105, 27 Stat. 445 (U. S. Comp. St. 1901, p. 2946)], the respondents should have been absolved from liability, unless it appears by a fair preponderance of the testimony that the damage complained of resulted from some fault or neglect on their part which is distinctly set forth in the libel.

"(2) The court below erred in holding that the skins became wet with brine from the barrels of citron.

"(3) The court erred in finding that there was an 'absence on the part of the respondents of the special care that they were required to exercise [in stowage] by reason of the character of the cargo.'

"(4) The damage was caused by heating and sweating and decay, or by the inherent vice of the skins, within the meaning of the exceptions contained in the bills of lading and the third section of the Harter act."

In support of these contentions respondents rely on the fact that the bales of skins next forward of the barrels of citron were not wet or damaged, and that there was no leakage on the manganese under the barrels, and that the bottom of the ship was dry. The established rule is that where the evidence shows that the damage was occasioned by one of the causes for which the vessel was exempted from liability, in the absence of some fault, such as negligent stowage, the burden is upon the libelant to show that it might have been prevented by reasonable skill. and diligence on the part of those employed by the vessel. Clark v. Barnwell, 12 How. 272, 13 L. Ed. 985; Cau v. Texas & Pacific Railway Co. (194 U. S. 427, 432, 24 Sup. Ct. 663, 48 L. Ed. 1053.

, But libelant contends, not only that the goods were negligently stowed, but that the character of the damage is such that it must have been caused by the brine from the citron, and could not possibly have occurred through any of the excepted causes in the bill of lading. In support of this contention the following facts appear to be proved: (1) Damage by sea water produces a dark blue color on the flesh side of the skins. (2) Heating or sweating or country damage produces a kind of reddish color on the flesh side of the skins.

The testimony of Lazarus, the libelant, Kutschbach, his manager, and of Cooper and Friel, experts, to this effect, is confirmed, except so far as concerns "country damage," by that of respondents' witness Parker, an expert appraiser. He was of the opinion that the damage was "country damage," he meaning thereby damage occurring from exposure to weather or rain, which took place prior to shipment, and therefore would have been apparent at the time of shipment. The testimony that in the course of decay these colors disappear and the skins become brown from rot does not materially help the respondents, because the evidence here shows that, even if the skins were brown, as testified to by some witnesses, they were not generally rotten, except in spots in some cases, and that the hair did not readily come off. It was not claimed that there was warmth or heat in the skins on arrival. It is not contended that the skins were damaged by sea water. The skins were neither of a dark blue nor reddish color. It would seem, therefore, that the damage was not due to any of the causes excepted in the bill of lading.

The bill of lading admitted that the skins were received in good condition. There is some intimation that the skins were not in good order when received, and that the mate of the vessel so stated. But he was not called, and no evidence was introduced to prove this point.

It did not appear that the damage was from the nature of the goods when received, for there is no proof that they were not properly cured, and the master testified they were in the condition in which such skins

were usually received; nor from decay or putrefaction, through heating or sweating or country damage, for they were not warm, the flesh side of the skins was not of a reddish color, and they were not sufficiently decayed to turn brown; no country damage was proved, and it appeared that, if there had been country damage, it would probably have been manifest when the goods were shipped. But as this is a close question, and it may not be clear that the conclusion is supported by a sufficient preponderance of testimony, we will further inquire whether the damage was caused by the dampness and wet from the citron brine due to negligent stowage.

There is a sharp conflict of testimony on this point. The libelant's witnesses swore that the skins were wet, and covered with slime inside and out, so that the normal weight of a bale of say 350 pounds was in some cases increased to 700 pounds. They testified that this slimy substance was not salty or briny, but sticky, and had a sweetish gummy taste. In fact, citron brine has no such taste, but is even more salty than sea water. Apparently the sweet taste referred to came from the contact of barrels and skins with crushed currants and raisins, which constituted about one-third of the cargo and had been spilled on the dock. The testimony of Kutschbach, libelant's main witness, is discredited by manifestly erroneous statements that the barrels of citron were piled on top of the skins and unloaded over them, and by extravagant testimony concerning broken and leaky citron barrels. The skins, however, were wet and damaged, and libelant's witnesses claimed to show this was due to leakage. Several witnesses swore they saw some of the casks leaking badly. It is proved that usually about half the casks in such importations leak, and that the casks lose about half or more of the brine, and that this leakage must have occurred during the voyage because, if it had occurred before shipment, the citron would rot.

The witnesses for the respondents swear that they saw only one or two barrels leaking. These leaks were claimed to be due to accidents in unloading. Vincent, respondents' clerk, who delivered the cargo, testified as follows:

"Q. Have you any independent recollection about them apart from your books? A. About the casks? Q. Yes. A. I kind of think they was about as good as we have had; in fact, better, because I imagine they were the new casks. * * * Q. Do you know anything about the condition in which citron generally comes? A. Yes, sir. Q. The barrels are quite apt to leak, aren't they? A. Yes. Q. They leak occasionally? A. Occasionally. Q. Quite often? A. In some cases; yes, sir. * * * Q. When you say 'some cases,' you mean how often? A. About 60 per cent. is not leaking; that is in receiving. Q. Say about 60 per cent. of the barrels— A. Are in good condition. Q. And 40 per cent. leaking? A. Yes, sir. Q. That is your general experience? A. Yes, sir. Q. That was your experience with this cargo? A. No, sir. Q. Do you know whether these were leaking or not? A. Yes, sir. Q. What proportion were leaking? A. One barrel I saw myself. Q. Did you look all the barrels over? A. Yes, sir; I saw them loaded on the lighter. Q. Are you positive they were full of brine? A. Yes, sir. Q. And not any leaked out? A. Yes, sir. Q. Notwithstanding the evidence of the last witness, Mr. Bell, to the effect that all the citron that comes in leaks out from a third, half or three-quarters? A. Yes, sir. Q. You didn't open any of those? A. No, sir. Q. Not one? A. No, sir."

Much stress is laid by respondents on the fact that other goat-skins, stowed next forward of the citron, were received dry and in good order; and by libelant that the skins next aft of the skins in question were received in good order. But the latter appear to have been air cured or flint dried, which do not so readily absorb moisture, and it does not appear which kind of skins were stowed forward of the citron, so that this testimony, which might otherwise have had great weight, seems almost immaterial. Weight, however, is properly attached to the following admission of re-spondents' witness J. McCarroll, who sorted libelant's skins:

"Q. Was there any difference between those that were on top and those which were on the bottom? A. Those that were on top seemed to be all right. * * * Q. They took off some of the bales that seemed to be good skins? A. The bales of wool and skins came out first. Q. Answer my question. They took off some of the skins from the top of the pile that seemed to be without this blue mold or slime on. Is that right? A. Some of them; yes. Q. And as they worked down they commenced to take out these skins that had the slimy substance on and blue mold. Is that right? A. Yes."

Furthermore, respondents' witness Tiffany testified as follows:

"Q. So you think you are enough of an expert to tell whether a skin is damaged by brine from citron, by brine from any other merchandise, or by sea water? A. I couldn't tell the difference whether skins were damaged from brine from citron, or from a barrel of beef, or anything else. But I could tell the difference from brine damage and salt water damage. Q. How? A. By the fomentation of the salt that would be left on any piece of cloth, skin, or board. Q. Do you know how sea water damage shows itself on skins? A. It would naturally blacken the skin. It would naturally blacken the piece of pine board. Q. Do you know how citron damage shows itself on the flesh side of the skin? A. I couldn't tell you, only it would leave lots of granulated fine specimens of salt there from the brine."

The witness for libellant, Lowery, had already testified that this was the appearance of these skins—

"All stained with salt, and as if they had been salted over again in the ship, and come out of a packing house."

And respondents' witness C. McCarroll testified as follows:

"Q. How did they become damp, in your opinion? A. In my opinion they was dry salted, and on the mats absorbed moisture and melted the salt."

In view of the whole testimony, it must be found that the barrels were in the usual condition of such barrels, and must have leaked considerably during the voyage. The court below has found that the damage was due to leakage and absorption. The court also held that:

"There was an absence on the part of the respondents of the special care that they were required to exercise by reason of the character of the cargo, and the libelant is entitled to recover."

The construction of the temporary bulkhead has already been described. It was constructed in the expectation that wet cargo would be received at Constantinople; but it was put up chiefly in order to keep the barrels from falling, and it would not keep out water or dampness from the barrels. As to whether the stowage is the usual kind, and proper and sufficient, the witnesses are directly in conflict. They agree, however, that it would be better

stowage to put such cargo in separate compartments, or to stow the dry cargo on top. The logic of this review of the testimony seems to lead to the following conclusions:

The libelant bought this consignment on the faith of a bill of lading in which respondents receipted for the skins as in good order and condition. They arrived damaged, and the preponderance of testimony indicates that this damage was not due to any of the excepted causes. The method of stowage was not the best. The temporary bulkhead was not tight. It was not adapted to protect this peculiar kind of skins from damage from absorption. That they were damaged by leakage or absorption appears from the fact that the top ones were dry, that the damage was unequally distributed among the different part of the skins, that the brine was leaking from the citron barrels, and that the damage was of an unusual kind; and while it resulted, not from dampness in the hold, nor from sea water, it was due to some absorption of moisture, which left the skins covered with salt. In these circumstances, we think the respondents were liable for negligence in the stowage of the cargo, under the decision of this court in Botany Worsted Mills v. Knott, 82 Fed. 471, 27 C. C. A. 326, affirmed by the Supreme Court 179 U. S. 69, 21 Sup. Ct. 30, 45 L. Ed. 90.

The decree is affirmed, with interest and costs.