**WATERMAN S. S. CORPORATION v. UNITED STATES SMELTING, REFINING & MINING CO.**

No. 11554.

Circuit Court of Appeals, Fifth Circuit.

May 24, 1946.

Rehearing Denied June 18, 1946.

Harry F. Stiles, Jr., of New Orleans, La., for appellant.

F. Herbert Prem, of New York City, and Louis C. Guidry, of New Orleans, La., for appellee.

Before HUTCHESON, HOLMES, and LEE, Circuit Judges.

LEE, Circuit Judge.

Waterman Steamship Corporation, respondent below, prosecuted this appeal from a final decree in admiralty awarding U. S. Smelting, Refining & Mining Co., libellant below, damages for the loss of thirteen pieces of structural steel from a shipment of 698 pieces. Libelant, hereinafter called the shipper, delivered the steel to respondent, hereinafter called the carrier, at Baltimore, for carriage on its vessel, the "West Kyska," to the shipper's order at Seattle. The carrier stowed a quantity of this steel on deck, with permission granted by a bill of lading for on-deck stowage, and stowed the remainder under deck. During the course of the voyage thirteen pieces of steel, comprising a part of the on-deck cargo, were lost overboard. This appeal concerns the question of the carrier's liability for the loss of these steel plates.[1] The court below held that the thirteen pieces of steel were lost overboard from the West Kyska by reason of the carrier's negligence in failing to properly and carefully stow, carry, keep, and care for the same; and that neither peril of the sea nor peril incident to on-deck stowage was present or responsible for such loss. It awarded damages in the sum of $8,064.18 with interest.

On this appeal the carrier contends:

"I—Where Goods are Shipped under a bill of lading specifically providing for on-deck carriage at 'Owner's risk', the cargo owner cannot recover in the absence of a showing of active negligence on the part of the carrier.

"II—In order to recover for loss of cargo carried on deck, the owner of such cargo has the burden of affirmatively proving that the loss was caused by negligence in stowage or care and not only has appellee failed in this respect but on the contrary the evidence shows that due diligence was used.

"III—The loss was occasioned by a latent defect in the pelican hook securing the #1 deck stow for which respondent is not liable.

"IV—The loss was due to peril of the sea for which appellant is not liable.

"V—In the event appellant should be held liable, appellee's recovery should be limited to $500 per piece or package lost but in no event may it exceed the arrived sound market value."

The parties stipulated that the thirteen plates of steel lost were in good order and condition on delivery to the carrier in Baltimore. The parties agree that the carrier was a common carrier of these goods.

The straight bill of lading covering the steel lost provided:

(1) That 771 tons of a total shipment of 1052 tons were loaded on deck.

(2) That goods carried on deck were at "owner's risk."

(3) That the terms "owner's risk" meant that the carrier should not be liable for loss or damages "unless shown to have resulted from some negligence or default of carrier against liability for which it is precluded by law from contracting."

(4) An incorporation of the provisions of the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq., Apr. 16, 1936, Chap. 229, 49 Stat. 1207 et seq.

(5) That all risks of loss or damage by perils incident to carriage of goods on deck should be borne by cargo owner, and the provisions of the Carriage of Goods by Sea Act notwithstanding § 1(c) thereof should govern the custody and carriage of such goods.

The 771 tons of deck stow was divided into several piles, each approximately 8 feet high. The steel lost overboard was stowed on a pile to the port side between hatch No. 1 and the rail. Two galvanized chain lashings with links 7/8 of an inch in

---

[1] The court below held that libellant is not entitled to recover from respondent for any damages to steel that was not lost overboard.

diameter were stretched from two pad-eyes at the port side of the hatch coaming over the piles of steel to two pad-eyes located at the base of the ship's rail. A "pelican hook" shackled each chain lashing to the pad-eye at the hatch coaming. A turnbuckle between each pelican hook and the chain lashing kept the chain lashing taut. A "pelican hook" is a hook with a ring that holds the two shanks of the hook together. Three wood stanchions braced against the bulwark or rail held the steel pile away from the rail, a distance of 6 feet.

Captain Wood testified that from Wilmington, California, to San Francisco to Seattle, the vessel encountered no weather but such as one would expect for that season of the year; that the thirteen plates of steel were lost overboard on May 3, 1941, three days out of San Francisco, about twenty miles west of Gray's Harbor; that neither vessel nor deck cargo sustained other damage or loss during that leg of the voyage; that neither the two chain lashings nor the four pad-eyes nor the two shackles, to which the chain lashings were made fast on one end, broke; that on that day the two pelican hooks, that secured the two lashings on the stow on the port side of hatch No. 1 to the pad-eyes at the base of the hatch coaming, bent in such a fashion that permitted the release of the lashings. As a result, the full weight of the upper half of the steel pile, at about the level of the lowermost 3 feet of stow, sheered off the three port stanchions; and the loose steel at the top of the pile slid to port over the braces and the rail into the sea.

Captain Wood further testified that the wind at the time the steel went overboard was force 3 on the Beaufort scale (8 to 12 miles, gentle) and a heavy westerly swell was striking the ship about two points forward to port beam; that the vessel was rolling heavily but running at full normal speed of 10½ knots on a course of 341 Standard compass; that just before the cargo was lost he observed the sea was "apparently building up gradually," but that there was nothing unusual in the sky; that he was preparing to alter the West Kyska's course in order to prevent her rolling "so heavily"; and that at the time the steel went overboard, after a very severe roll to port, the next wave jerked the vessel "kind of short" and caused a twisting motion as "she righted herself too sudden." The master was positive that no water came aboard on the roll which he so described as unusual.

The parties stipulated that if one F. A. Finch, surveyor of the Board of Underwriters of New York, had had the opportunity to testify, he would have said that at the port of Baltimore, Maryland, the lashings and accompanying gear appeared then to be in good and proper condition.

The parties also stipulated that if certain representatives of the respondent had had the opportunity to testify, they would have said that neither the pelican hooks nor the turnbuckles were ever subsequently delivered to respondent, and were, so far as known by respondent, still on said vessel; and that the United States had taken control of the West Kyska on August 26, 1943.

The shipper's construction engineer testified that upon discharge by the West Kyska of libellant's steel shipment at Seattle, the cargo checked thirteen pieces short, and that the replacement value of said pieces F.O.B. Seattle was $8,064.18, which sum libellant actually disbursed in order to provide forthwith the necessary substitute pieces for carrying on dredge construction at Nome, Alaska; and that the value of the pieces in Seattle was the replacement value.

▆▆▆▆ An appeal in admiralty is a trial de novo, and the findings of fact made by the court below are not binding on this court.[2] Since the court below took no oral testimony and took all testimony on depositions, no opportunity was afforded the lower court to see and hear the witnesses; hence, we have no reason to give weight to the lower court's findings of fact.[3]

▆▆▆▆ The bill of lading incorporates by reference the provisions of the United

[2] Coryell v. Phipps, 5 Cir., 1942, 128 F.2d 702, affirmed 1942, 317 U.S. 406, 63 S.Ct. 291, 83 L.Ed. 363; The Portaritisa, 5 Cir., 1942, 131 F.2d 362, certiorari denied 1943 Pavlis v. Jackson, 318 U.S. 769, 63 S.Ct. 761, 87 L.Ed. 1140.

[3] Cf. Colvin v. Kokusai Kisen Kabushiki Kaisha, 5 Cir., 1934, 72 F.2d 44.

States Carriage of Goods by Sea Act. While the Act does not apply either to carriage of goods not in foreign trade[4] or to cargo carried on deck under provisions in the bill of lading for on-deck carriage,[5] the parties may by the terms of their bill of lading agree that its provisions shall apply to cargo carried on deck between ports of the United States.[6] Section 4(2) of the Act provides that "Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from * * * (c) Perils * * * of the sea * * *; [or] (p) Latent defects not discoverable by due diligence * * *." Upon the carrier is placed the burden of going forward to show a peril of the sea or a latent defect; it also has the risk of non-persuasion.[7]

"* * * The reason for the rule is apparent. He is a bailee intrusted with the shipper's goods, with respect to the care and safe delivery of which the law imposes upon him an extraordinary duty. Discharge of the duty is peculiarly within his control. All the facts and circumstances upon which he may rely to relieve him of that duty are peculiarly within his knowledge and usually unknown to the shipper. In consequence, the law casts upon him the burden of the loss which he cannot explain or, explaining, bring within the exceptional case in which he is relieved from liability. * * *"[8]

■■ A true latent defect is a flaw in the metal and is not caused by the use of the metallic object. "A latent defect is one that could not be discovered by any known and customary test."[9]

"A comparative local weakness must be based upon some *visible* defect in the material, or should be shown under a test to be fairly pronounced, in order to indicate that bursting was not due to wear and tear or inevitable depreciation, rather than to what can be termed a latent defect in any workable sense."[10]

A true latent defect is not a gradual deterioration but is a defect in the metal.[11] The ship owner has the burden of showing that the latent defect was not discoverable.[12]

The record discloses no evidence on the subject of a latent defect. The carrier merely argues, "A reasonable explanation of the cause of the straightening out of the pelican hooks is that a latent defect existed in them."

■ As was said in The Feltre, 9 Cir., 1929, 30 F.2d 62, 64, "The only suggestion of latent defects is found in * * * conjectures * * *. Conjecture will not be permitted to take the place of proof."

■ The carrier did not introduce the pelican hooks into evidence. The carrier offers as its excuse for this failure that the Government requisitioned the ship before the shipper brought this suit. Since this is a plausible excuse for not producing the hooks in court, the court will not draw the inference that an examination of the hooks would show a latent defect.[13] The consequences of its inability to produce the hooks in court, however, must fall upon the carrier, for without the hooks and without testimony by a competent witness on the latent defect the carrier cannot satisfy its

---

[4] 46 U.S.C.A. § 1300, Apr. 16, 1936, Chap. 229, 49 Stat. 1207.

[5] 46 U.S.C.A. § 1301(c).

[6] The Agwimoon, D.C., 24 F.2d 864, 867, affirmed Atlantic Gulf & West Indies S. S. Line v. Interocean Oil Co., 4 Cir., 1929, 31 F.2d 1006, certiorari denied 279 U.S. 874, 49 S.Ct. 514, 73 L.Ed. 1009; The Cornelia, D.C.S.D.N.Y.1926, 15 F.2d 245, 247.

[7] 9 Wigmore on Evidence, § 2508; Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 109, 62 S.Ct. 156, 86 L.Ed. 89, 95; The Edwin I. Morrison, 153 U.S. 199, 212, 14 S.Ct. 823, 38 L.Ed. 688, 693, 1894; The Beeche Dene, 5 Cir., 1893, 55 F. 525.

[8] Schnell v. The Vallescura, 1934, 293 U.S. 296, 304, 307, 55 S.Ct. 194, 196, 79 L.Ed. 373, 377.

[9] The Bill, D.C.Md.1942, 47 F.Supp. 969, 978, affirmed Lorentzen v. Brazil Oiticica, Inc., 4 Cir., 1944, 145 F.2d 470.

[10] Mellon v. Federal Insurance Co., D. C.S.D.N.Y., 1926, 14 F.2d 997, 1000.

[11] The Bill, supra, 47 F.Supp. at page 978.

[12] The Toledo, D.C.E.D.N.Y.1939, 30 F. Supp. 93, 99, affirmed 2 Cir., 1941, 122 F.2d 255, certiorari denied Isbrandtsen-Moller Co. v. The Toledo, 1941, 314 U.S. 689, 62 S.Ct. 302, 86 L.Ed. 551.

[13] Cf. Colvin v. Kokusai, etc., supra, 72 F.2d at page 46.

burden of proving the existence of latent defects.[14]

■ The certificate granted by Captain Finch, a Board of Underwriters inspector at Baltimore, to the effect that the lashings and gear used to secure it appeared to be in good and proper condition, does not merit any weight.[15]

■ Because the existence of a latent defect in the hooks is left in reasonable doubt, the carrier has not borne its burden of proving the existence of a latent defect.

■ The Giulia, 2 Cir., 218 F. 744, 746, concisely defines perils of the seas[16] in these words:

"Perils of the seas are understood to mean those perils which are peculiar to the sea, and which are of an extraordinary nature or arise from irresistable force or overwhelming power, and which cannot be guarded against by the ordinary exertions of human skill and prudence."

■ The only evidence in the record on "peril of the sea" is the testimony of the master. He testified that a very severe roll and a short jerk on the next wave occasioned the release of the cargo from its lashings; and that the condition of the sea at the time was a "heavy westerly swell" and that the wind force on the Beaufort scale was 3. He also testified that at the time of the alleged "severe roll" his vessel took no water on deck and the ship suffered no damage. Force 3 on the Beaufort scale is characterized as a gentle breeze, a wind velocity of 8 to 12 miles per hour.

The height of the waves produced in the open ocean is ordinarily in direct, simple proportion to the velocity of the wind.[17] Was a "wind velocity of 8 to 12 miles per hour," characterized by number 3 on the Beaufort scale, an "irresistable force * * * which cannot be guarded against by the ordinary exertions of human skill and prudence"? If such a wind was not that irresistable force, we must assume the master could have guarded against the consequences of a "very severe roll" accompanying that wind.

In United States Industrial Alcohol Co. v. Calmar S. S. Corp., D.C.S.D.N.Y. 1931, 53 F.2d 1023, 1024, the court held that the element of a sea peril was entirely absent The circumstances were, "At no time was the force of the wind which preceded the loss of a part of libellant's cargo in excess of 7 on the Beaufort scale. *The resulting seas, while they were sufficient to wash the decks continuously and to cause the vessel to roll violently, were only such as reasonably were to be encountered on the voyage.*" [Emphasis ours.]

In The Leerdam, supra, 8 F.2d at page 296, "Whilst the weather was shown to be heavy and the trip rough, there was not that unusual stress or wind velocity or tempestuous condition contemplated by the accepted definitions of perils of the sea, when urged as a defense. * * * *The ship was otherwise undamaged in hull, tackle, or apparel on reaching Havana.*" [Emphasis ours.] In affirming upon appeal, we said, 17 F.2d 586, 587:

"We do not think that the weather was shown to be rough enough to be considered a peril of the sea. It could well have been foreseen as one of the ordinary incidents of the voyage."

In The Colima, D.C.E.D.N.Y.1897, 82 F. 665, at page 673, where the court in deciding whether a ship should have been able to brave a certain storm, the court considered whether the same sea injured any other ship.

[14] The Leerdam, D.C.La.1925, 8 F.2d 295, 296, affirmed Neederlandsche Amerikaansche Stoomvaart Maatschappij v. Mediterranean & General Traders, 5 Cir., 1927, 17 F.2d 586.

[15] Bank Line v. Porter, 4 Cir., 1928, 25 F.2d 843, 845, certiorari denied 278 U. S. 623, 49 S.Ct. 25, 78 L.Ed. 544; The Abbazia, D.C.E.D.N.Y.1904, 127 F. 495; The Vestris, D.C.S.D.N.Y.1932, 60 F.2d 273, 289, 290; The Negus, D.C.S.D.N.Y. 1923, 298 F. 749, 751, affirmed 2 Cir., 298 F. 752; and The Feltre, supra, 30 F.2d 64.

[16] See also The Josephine, 3 Cir., 1931, 49 F.2d 207, 210.

[17] 23 Encyclopaedia Britannica 441, 1944; 4 idem 69; while an earthquake may cause waves on the ocean, 7 idem 847, we think that the carrier had the burden of proving by seismographic records, 7 idem 845, that an earthquake produced the wave described by the master.

In The Edith, 2 Cir., 1926, 10 F.2d 684, 686, where a strong easterly gale blew, the seas washed over the ship very heavily, and the ship underwent one of the worst storms in the master's experience, the court pointed out that the physical injury to the ship was very light, nothing was broken, no structural injury was received; and held that a technical "peril of the sea" did not exist.

Where the master of a ship testifies that the "very severe roll" did not wash the decks; that the accompanying weather was not unusual for that vicinity and time of the year; that the "very severe roll" caused no other injury on the ship or any injury to any other ship in the vicinity, more than a reasonable doubt exists that a "peril of the sea" caused the loss overboard of the cargo. Therefore, the carrier has not borne its burden of proving the existence of a "peril of the sea." "It sometimes happens that the officers of a vessel are prone to 'stick by the ship.' "[18]

Where it is doubtful whether either a latent defect or a peril of the sea exists, even in the absence of proof of any negligence, the carrier has not carried its burden of proof.[19] Therefore, we need not consider whether the carrier owed the shipper any duty of care in stowing the steel on board and whether the carrier discharged any such duty.

In summary, the shipper may recover for the loss of the steel on either of two grounds: (1) The carrier did not bear its risk of non-persuasion in proving that a "peril of the sea" caused the loss; or (2) the carrier did not bear its risk of non-persuasion in proving that a "latent defect" caused the loss.

46 U.S.C.A. § 1304(5) provides that:

"Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit * * * unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading."

The bill of lading here contains no statement as to the value of the merchandise. The carrier argues that since thirteen pieces of steel were lost, the recovery should be limited to $6500, thirteen multiplied by $500. Therefore, we must interpret the statutory term, "customary freight unit." The steel was not in packages and the bill of lading provides for a tariff rate of 64¢ per 100 pounds. Therefore, the limitation of the Carriage of Goods by Sea Act does not apply since $500 multiplied by each 100 pounds of steel lost would produce a sum far greater than the damages allowed.[20]

Our interpretation of the statute is based upon the clear reasoning set out in The Bill,[21] to wit:

"Upon consideration of this hitherto unadjudicated point, I conclude that the phrase 'per customary freight unit' in this context in the light of its legislative history, refers to the unit of quantity, weight or measurement of the cargo customarily used as the basis for the calculation of the freight rate to be charged. Generally, in marine contracts the word 'freight' is used to denote remuneration or reward for carriage of goods by ship, rather than the goods themselves. Benedict on Admiralty, Vol. I, 6th Ed., § 92, p. 284; Carver on Carriage of Goods by Sea, 8th Ed., § 543, p. 755; Richards on Insurance, 4th Ed., § 424, p. 765. Furthermore, in this case the respondent has submitted the deposition evidence given by a competent witness experienced in the trade who used the phrase

---

[18] The Willowpool, N.Y.D.C.S.D.1935, 12 F.Supp. 96, 99, affirmed John W. Higman & Co. v. The Willowpool, 2 Cir., 1936, 86 F.2d 1002.

[19] Commercial Molasses Corp. v. New York Tank Barge Corp., supra, 314 U.S. at page 109, 62 S.Ct. at page 160, 86 L.Ed. 89; Jahn v. The Folmina, 212 U.S. 354, 363, 29 S.Ct. 363, 53 L.Ed. 547, 551, 15 Ann.Cas. 748.

[20] Cf. Stirnimann v. The San Diego, 2 Cir., 1945, 148 F.2d 141.

[21] D.C.Md.1944, 55 F.Supp. 780, 783, affirmed Lorentzen v. Brazil Oiticica, Inc., 4 Cir., 1944, 145 F.2d 470.

'freight rate' and 'freight unit' synonymously. The witness also stated in effect that 1,000 kilos of oil did constitute the 'customary freight unit'. This evidence was uncontradicted."

A witness for the shipper testified that the replacement value of the thirteen sheets of steel was $8,064.18. The shipper's witness testified that the replacement value represented the value of the steel plates at Seattle. No other evidence in the record exists as to the value of the steel lost overboard. The carrier urges that the measure of damages may not be based on the replacement cost of nondelivered cargo. In the absence of any contrary evidence, "the value at Seattle" may be taken as the market value. Furthermore, the amount of injury suffered is the sum in question and not necessarily the market value of the goods lost.[22] The Supreme Court has said:

"The test of market value is * * * but a convenient means of getting at the loss suffered. It may be discarded and other more accurate means resorted to, if, for special reasons, it is not exact or otherwise not applicable." [23]

The judgment appealed from is affirmed.

---

[22] Illinois Central R. Co. v. Crail, 1929, 281 U.S. 57, 64, 50 S.Ct. 180, 181, 74 L. Ed. 699, 703, 67 A.L.R. 1423.

[23] Illinois Central R. Co. v. Crail, supra; see also United States v. Palmer & Parker, Co., 1 Cir., 1932, 61 F.2d 455, 459.