**SAWYER et al. v. McDONALD et al.**
**THE CONTENT S.**

**THE FOUNDATION ARANMORE.**
No. 11937.

Circuit Court of Appeals, Fifth Circuit.
Jan. 8, 1948.

Lewis H. Fogle, Jr., William Kirtley, and Bertram R. Coleman, all of Miami, Fla., for appellants.

John C. Prizer, of New York City, and David W. Dyer and Norris McElya, both of Miami, Fla., for appellees.

Before SIBLEY, HUTCHESON, and HOLMES, Circuit Judges.

HOLMES, Circuit Judge.

This suit arose out of a collision that occurred on January 9, 1946, in the Old Bahama Channel, which lies to the North of mid-Cuba. The Foundation Aranmore, a small steamer about 240 feet long with a 34-feet beam, was proceeding south easterly through the channel bound in ballast on a voyage from Port Everglades to Guadalupe for bananas. The motor vessel Content S, a converted yacht 120 feet long with a 20-feet beam, was proceeding northwesterly through the same channel to Miami with a cargo of bananas. The night was clear with no moon, the sea moderate. There was a light easterly breeze, and a slight westerly set of the current through the channel. The Content S sank within five to ten minutes after the collision; the Aranmore was not damaged.

The Content S was the privileged vessel, and a collision was imminent when the Second Mate of the Aranmore ordered its wheel put hard-to-port, and gave two short blasts of the whistle, indicating that the Aranmore was swinging to port apparently intending to cross over the bow of the Content S. The Second Mate of the Aranmore was the only witness for the claimant, other than the man at the wheel, who could give material testimony upon the relative positions of the two vessels immediately before this order was given. He testified that the Aranmore swung to port and in doing so collided with the Content S, striking her port side, opposite the wheel house, breaking the hull planking of the Content S, and causing her to settle almost immediately.

Giving due weight to the findings of the lower court, we think they were clearly erroneous in several important particulars. The principal rule that governs this case is generally known as the starboard-hand crossing rule. It is that when two vessels are on steady courses, which will cross or intersect so as to present a risk of collision, the vessel which has the approaching vessel on her starboard side is the burdened vessel and must keep out of the way of the other.[1] The privileged vessel is under duty to keep her same course and speed, but this duty is not absolute if special circumstances render a departure therefrom necessary in order to avoid immediate danger.[2]

In the instant case, the vessels were not in a narrow channel; they were in a channel several miles in width, and no assumption was necessary on the part of the Content S that the Aranmore would alter her course a long time in advance of meeting the approaching Content S. Even until just before the two-blasts signal was given, it would have been a simple matter for the claimant to avoid the collision by turning to starboard rather than to port. The Aranmore was travelling at about nine knots and, according to its second mate, saw the green light of the Content S when the two vessels were at a greater distance than from one-third to one-fourth of a mile apart. The crucial controversy here is as to the position of, and what was done by,

---

[1] 33 U.S.C.A. § 104; 15 C.J.S., Collision, § 48.

[2] 33 U.S.C.A. § 112; The Comus, 2 Cir., 19 F.2d 774; The Steel Inventor, 2 Cir., 43 F.2d 958.

each of the vessels immediately preceding the fateful two-blasts whistle of the Aranmore and its hard-to-port maneuver. This was a negligent and exceedingly dangerous maneuver.

The contention that the two vessels bumped into each other with only a slight shock to the Aranmore will not stand analysis. The undisputed evidence shows that the Content S was staunch and strong, having teak planking on the inside and mahogany planking on the outside. She was heavily loaded with over 6000 stems of bananas. The combined speed of the two vessels was about 19 knots. The prow of the Aranmore cut a deep hole into the port side of the Content S, closing the door of her engine room. The latter sank so rapidly that her crew did not have time to save the log book or their personal belongings. Some of the crew left the ship naked, and had to swim to the only life boat that was cut loose before the victim of the collision disappeared beneath the surface of the ocean. A seaworthy vessel does not sink so fast from only a slight bump.

The court below gave full credence to the testimony of the claimant's witnesses. It did not see or hear them testify, and we are at liberty to draw our own conclusions as to their credibility. The appellees contend that the two vessels were upon identically opposite courses. The court below did not so find. It found that when the vessels came close enough for side lights to be seen, the green light of each was open to the other; that the vessels did not meet head on; that there was no question of the Aranmore giving the signal of two blasts indicating it was directing its course to port. It exonerated the Aranmore for violating the crossing rule because, it said: "If that only had happened, the vessels should have passed safely and without collision. That they did not forces the Court to conclude that something else did happen, and from the testimony I conclude that Mate Anderson's account is the logical one.[3] He had reason to believe that the safety of the vessels called for his turning to his, the Foundation Aranmore's, port side. In so doing, and with the swinging to the right by the Content S, the port side of the Content S was brought into contact with the starboard side of the Foundation Aranmore."

Beyond doubt, the port side of the Content S was brought into contact with the Aranmore, but whether it was the starboard side or the bow of the latter is in controversy. In either event, a hole was driven into the port side of the Content S that closed the door of her engine room and caused her to sink in less than ten minutes. If, as the court said, it was the starboard side of the Aranmore, it furnishes still greater proof of the applicability of the crossing rule.[4] Neither Anderson nor the man at the wheel ever saw the red light of the Content S until after the collision. Neither vessel was overtaking the other. The witness Brin, who was at the wheel of the Aranmore, said that he first saw the Content S more than fifteen minutes before the collision; that she was bearing down upon him from the Aranmore's starboard side;[5] that the two-blasts signal was blown immediately after the order to port was given;[6] that he saw no red light on the Content S; that the Content S changed her course after the two blasts were blown.

We find that the Foundation Aranmore was the principal offender in bringing about this collision. She was the burdened vessel, and failed to keep out of the way of the privileged vessel. Neither vessel did anything in time to avoid the collision. Under

---

3 Anderson testified only by deposition. The trial court neither saw nor heard him, and had no opportunity to observe his manner or demeanor on the witness stand.

4 "All the rules provide in identical language that 'when two steam vessels are crossing, so as to involve risk of collision, the vessel which has the other on her starboard side shall keep out of the way of the other.' 33 U.S.C.A. §§ 104, 204, 283. The vessels are crossing when they show opposite sides but are so nearly even that the situation is not that of a vessel being overtaken by another." Robinson on Admiralty, p. 809. See also 15 C.J.S., Collision, § 48.

5 "Q. Was she going the same way you were or another? A. Another way she was going. Down and we were going up." T. p. 83.

6 "A. When he signal he tell me to put it hard to port, just one and then the other." T. p. 84.

Article 19 of the International Rules 33 U.S.C.A. § 104, the Content S had the right to keep her speed and course until the danger from doing so became apparent. The larger boat was under duty to keep out of her way. Both of these were steam vessels, and both were under way within the meaning of Section 62, Title 33, of the United States Code, Annotated.

In addition to the other evidence, the fact that they met, and that neither showed both their red and green lights to the other, convinces us that the larger vessel had the other on her starboard side and that the two were on converging courses. Mate Anderson testified that he sighted the Content S off his starboard bow between 1:16 and 1:53 A. M., which was at least 20 minutes before the collision; that at the same time, he sighted another vessel, which was off his port bow; that the latter was about a mile in the lead of the Content S; that he watched the lead vessel from his port side until she passed him, then walked to the starboard side and turned his glasses upon the Content S; that she was approximately a half mile from him, he being about half way between the two vessels, which were about a mile apart; that he watched these two vessels until his arms tired from holding his glasses upon them; and that he never slackened his speed or changed his course until he gave the signal and order to port.

■ Negligent as the navigation of the Aranmore appears to have been, the other vessel cannot be held faultless. There is no right of way into a collision. She saw the larger vessel, bearing down upon her with unslackening speed; and did nothing until too late, then did the wrong thing. While her situation was perilous, and she cannot be held responsible for a mere mistake of judgment in an emergency not caused by her negligence: nevertheless, had she used proper precaution, the collision might not have occurred. Under Article 29, she may not be exonerated for the neglect of any precaution required by the ordinary practice of seamen in the special circumstances of the case.[7] We think she should have given some signal to indicate her course before the collision became unavoidable.

For five miles these boats were in plain sight of each other, both approaching at full speed of nine and ten knots respectively, with range lights nearly closed, without opening perceptibly as they got nearer, which shows that they were nearly head on; and neither did anything to reach an understanding about their passing until a dangerous misunderstanding arose, when it was too late for anything to be done. It seems, as the cases cited below state, that it is hardly possible for a collision to happen under such conditions without fault on both sides. It is testified that the Aranmore's course was South 57 degrees East, and that of the Content S was Northwest by West, which is one degree off of precise reverse, but that one steering compass was 2 degrees variant. These differences in direction, with drift from wind and water, could, in two-and-a-half miles running to the meeting point, cause danger notwithstanding a possible starboard-to-starboard passing was indicated by the green lights. Danger did arise when they were close to meeting.

■ We do not doubt that the starboard bow of the Aranmore cut three feet deep into the port side of the Content S at its red light. The testimony of her crew is too clear and vivid on that point to be overcome by that from the crew of the other vessel, who could not see the impact. There was not a mere glancing contact of the vessels, but a real collision, though the larger vessel was not much shaken, and was unharmed. The momentum of the larger vessel carried the smaller one around to where the latter was pointed nearly backward, but she did not make a semicircle before the collision, as some witnesses attempted to say. The Content S was trying to make a port-to-port passage at the last minute; relying, as her master said to the mate (the latter twice so testified), on her being the privileged vessel and having the right of way; but she gave no signal; she tried too late, and had no room. The Aranmore ported hard, which brought her starboard bow, rather than her stem, against the port bow of the Content S; and then they were, we think,

---

[7] 33 U.S.C.A. § 121.

both dragged around crossways of their original courses, and practically alongside each other, until the Aranmore backed away. It was a plain collision, which could have been avoided if either had given signals in time, or even stopped her engines. Such a situation fastens fault on both vessels, notwithstanding one was privileged.

■ We have three sets of navigation rules, one for inland waters, one for the Great Lakes, and a third (the International Rules) for the open sea. They are much alike, but the two former expressly require signals to be answered, and the last does not; yet it is held that prudence may often require signals. This difference cuts no figure here, because there was no timely signal to be acted upon or answered. There are cases like this, with vessels in sight of each other at night, in which both were held to be at fault in spite of the privilege of one.[8] We are satisfied that Article 28, 33 U.S.C.A. § 113, applies by night as well as day; that the privilege of the vessel on the starboard gives way to circumstances; and that common prudence still is of force when there is any doubt about the course of an approaching vessel, particularly by night when distances cannot well be judged.

■ The fault of the Content S probably lay in relying too heavily on privilege, and in shifting her course slightly to starboard without signal in order to make the usual port-to-port passage. The fault of the Aranmore lay in her maintaining full speed on what would have been at best a close starboard-to-starboard passage, after observing that the range lights of the Content S were narrowing right in front of her; in giving no signal in time to reach an understanding; and probably in porting her course to insist upon starboard-to-starboard passage instead of steering to starboard. The collision was due to a last-minute misunderstanding, such as often results from fault on both sides. That the Content S circled in a half moon is an untenable contention. There was an effort to claim a shift of her cargo, which might account for it, but the effort wholly failed in proof. The crew of the Content S swore to the contrary, and even the claims of overloading and jettisoning were not proven. Both vessels did what their pilots required of them.

We think the damages should be divided. The judgment appealed from is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

---

[8] The Manitoba, 122 U.S. 97, 7 S.Ct. 1158, 30 L.Ed. 1095, was in Canadian waters. No signals; nearly opposite courses, known to each; both at fault. In The New York, 175 U.S. 187, 20 S.Ct. 67, 44 L.Ed. 126, also in Canadian waters, the various rules are discussed. It is there said one blast from privileged vessel means she will keep her course. Duty to stop engines in time is stressed; both held at fault, and case reversed for holding only one at fault. The West Hartland, 9 Cir., 2 F.2d 834, fits this case nicely and expresses our views; both held at fault. See also Societe, etc., v. United States, D.C., 43 F.2d 125. Signals were given when a mile and a half apart, which shows that whistling is to be done at night as well as by day, and at a distance to do good. It is said, however, that signal need not be given unless course is changed.