## GLOBE SOLVENTS CO. v. THE CALIFORNIA.

### No. 9221.

Circuit Court of Appeals, Third Circuit.

Argued Feb. 18, 1947.

Reargued Dec. 17, 1947.

Decided April 21, 1948.

Thomas E. Byrne, Jr., and Krusen, Evans & Shaw, all of Philadelphia, Pa., for appellant.

Edwyn H. Silberberg, Albert H. Friedman and Peter P. Zion, all of Philadelphia, Pa., for appellee.

Before BIGGS, GOODRICH, McLAUGHLIN, O'CONNELL, and KALODNER, Circuit Judges, and FOLLMER, District Judge.

FOLLMER, District Judge.

Appellee instituted a Libel in Rem in the Court below seeking to recover for damages to a cargo of lacquer solvent shipped from Philadelphia, Pennsylvania, to San Diego, California. The portion of the shipment here involved [1] consisted of seven hundred seven cases, each containing two five gallon cans. Appellee shipped the seven hundred seven cases of solvent, having first attached thereto a "Red Label" thus automatically classifying the same as inflammable. The Dock Receipt shows same received for shipment as a "Red Label" cargo.[2] Appellee made no special arrangements concerning, and exacted no specific requirements as to this shipment. It was unquestionably a deck cargo.[3]

The Appellant issued a non-negotiable bill of lading containing the provision "Loaded on Deck Owners Risk of Damage or Loss." Appellee concedes that "the

O'CONNELL, Circuit Judge, dissenting.

---

[1] The shipment also included fifty-one drums of a similar nature not here involved except as the testimony involving the method of stowage of the entire shipment refers thereto.

[2] The requirements as to the use of a "Red Label" on containers of inflammable liquids are set forth in Cumulative Supplement to Code of Fed. Reg. of the U. S., Title 46, Sec. 146.05-15(g) (1).

[3] Leeming in "Modern Ship Stowage" (U. S. Dept. of Commerce), Page 131, says:

"Dangerous goods include such commodities as corrosive acids, highly inflammable substances, and other materials which might damage the vessel and other cargo if stowed underdeck. Articles of this description that must be carried on deck are listed in 'Regulations Governing the Transportation, Storage, and Stowage of Explosive or Other Dangerous Articles on Board Vessels,' issued by the Bureau of Marine Inspection and Navigation."

placing of cargo on deck was in accordance with Federal regulations." [4] and was not a negligent act per se. Moreover, by attaching the "Red Label" and making no special arrangements it assented to its being so carried.

The cases were stowed three high on both sides of the deck between the drums and the after bulkhead of the midship house on dunnage consisting of three layers of one inch dunnage boards. The first layer of dunnage was laid athwartships, spaced about ten inches apart so that in case there was water there it would run off.[5] The second and third layers of dunnage were laid fore and aft solid. It covered the entire area on which the cases were stowed. The outboard side was protected by two by twelve inch planks, on end, three high, supported by four by four's and shored to the gunwale bars. On the inboard side one inch boards were used. This cribbing formed a protective wall "from the deck * * * as high as the cases." [6] At Philadelphia, when stowed, this was covered all over with good tarpaulins with a layer of dunnage across them and the entire shipment lashed securely with chains. Two days later upon arriving at Norfolk, as an additional precaution, the chains and top dunnage were removed, twelve rolls of tar paper were procured and laid over the top of the tarpaulin, "first layer 'thwartships and the second layer laid fore and aft," and three layers of dunnage boards over the tar paper and the entire cargo was again securely lashed with chains. The Master also testified he had found this "the best protection for any cargo, either in cargo holds or on deck." [7]

The ship ran into some heavy weather in the Carribbean and in the Gulf of Tehuantepec and shipped considerable water on deck to a depth of two to seven inches.

Upon delivery it was found that a great many of the cans were leaking due to "pinholing" from rust and corrosion. This was not confined to cans in the bottom tier. There was evidence that some of the cases were stained. Appellee's surveyor expressed the opinion that the staining was due to salt water wetting. Of the total shipment, eight cases (sixteen cans) plus one can or a total of eighty-five gallons were found sound. Six hundred ninety-eight cases (six thousand nine hundred eighty gallons) plus one can required transfer to new cans. The loss in leakage and in transferring to new cans was six hundred thirty-two and one-half gallons with a salvaged gallonage of six thousand four hundred thirty-seven and one-half gallons; it does not appear how this loss was distributed as to leakage or transfer.

The court below made certain findings [8] of which the most pertinent is "23. Respondent during the course of the voyage, despite knowledge that the seas washed the cargo, failed and neglected to provide dunnage of a height sufficient to raise cargo above the depth of the sea wash." On the basis of this finding the trial court concluded that there was negligence consisting of the failure of the carrier to provide adequate dunnage under the circumstances.[9] This was the sole negligence upon which the judgment for Appellee was predicated. The court referred to the fact that the vessel, a flush deck ship, was "deep

---

[4] For pertinent regulations see Cumulative Supplement to Code of Fed. Reg. of the U. S., Title 46, Sec. 146.21-4-5-100.

[5] Deposition of Captain Peters, Appendix 27a; also deposition of Chief Mate John Meissnersen, Appendix 56a.

[6] Deposition of Chief Mate John Meissnersen, Appendix 59a.

[7] Deposition of Captain Peters, Appendix 27a, 28a.

[8] Some of the pertinent findings are:

"19. It would not require much of a sea to wash water on deck of the S. S. California to a depth of 2-7 inches.

"20. The Master and Chief Mate of the S. S. California had knowledge that the vessel was deep loaded and that it would not take much of a sea to go over and get water on deck to a depth of 2-7 inches.

"21. The cargo owned by the Libellant while being transported by the Respondent was subjected to frequent sea washings.

"22. In the course of its travel the S. S. California was not subject to any unforeseen storms or any other extraordinary violent action of the elements which could not reasonably have been expected."

[9] The court correctly found that loading the cargo on deck was proper.

loaded," but there is nothing to show that this was improper.[10]

This shipment being between ports of the United States.[11] and, as we have already indicated, being properly on deck,[12] the Carriage of Goods by Sea Act, 46 U.S. C.A. § 1300 et seq., for both reasons, would ordinarily not apply. The appeal briefs of both parties so considered it.[13] Only one side of the bill of lading had been printed in the appendix to the Appellant's brief.[14] Because of a statement in Appellant's brief indicating an incorporation of the Carriage of Goods by Sea Act in the bill of lading by reference,[15] it was agreed at the time of the hearing that the remaining portion of the exhibit might be submitted, which has been done. Clause 1 of the printed conditions[16] does state that the Carriage of Goods by Sea Act, "shall be deemed to be incorporated herein." It provides further that "nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act." It also specifically provides that where the provisions govern, it shall include "before the goods are loaded on and after they are discharged from the vessel" and to that extent includes under the coverage of this Act[17] what would have otherwise been within the provisions of the Harter Act.[18] However, the Act as incorporated in the bill of lading specifically excepts on deck shipments.[19] Furthermore, Clause 1 of the

---

[10] Leeming in "Modern Ship Stowage," supra, Page 77, says:

" * * * In a strictly technical sense, the term 'flush deck' is applicable only to full scantling vessels without deck erections; but, in the absence of deck erections of the type described, a vessel having a spar, awning, or shelter deck may be described as a flush-deck vessel.

" * * * Full-scantling steamers, because of their strength, are permitted to load more deeply than other more lightly constructed vessels, * * *."

[11] 46 U.S.C.A. § 1300.

[12] 46 U.S.C.A. § 1301(c).

[13] Appellee's brief, Page 5, states, inter alia:

"The legend on the bill of lading ('loaded on deck at owners' risk of damage or loss') referred to above did not relieve the Appellant from its duty of using proper care in providing dunnage for the cargo stowed on deck. A contract to relieve a ship from liability for loss or damage arising from its negligence is void as against public policy. The Skipsea, 2 Cir., 9 F.2d 887; The Harter Act, 46 U.S.C.A. § 190."

Appellant's brief, Page 6, contained the statement,

"Respondent admits at the outset that it would be liable for damage to the goods of the Libellant which were, under the proofs in the case, caused by the negligence of the Respondent. Without going into an extended discussion of the Carriage of Goods by Sea Act, it is clear that this shipment was excepted from its provisions even though the printed form Bill of Lading incorporated it by reference."

[14] "Exhibit—Bill of Lading," Appendix 71a.

[15] The parties may by the terms of their bill of lading agree that its provisions shall apply to cargo carried on deck between ports of the United States. Waterman S. S. Corporation v. United States Smelting, Refining & Mining Co., 5 Cir., 155 F.2d 687.

[16] "1. This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. The provisions stated in said Act shall (except as may be otherwise specifically provided herein) govern before the goods are loaded on and after they are discharged from the vessel and throughout the entire time the goods are in the custody of the Carrier. The Carrier shall not be liable in any capacity whatsoever for any delay, nondelivery or misdelivery, or loss of or damage to the goods occurring while the goods are not in the actual custody of the Carrier."

[17] Sec. 1 of the Carriage of Goods by Sea Act, 46 U.S.C.A. 1301(e), provides "The term 'carriage of goods' covers the period from the time when the goods are loaded on to the time when they are discharged from the ship."

[18] 46 U.S.C.A. § 190 et seq.

[19] Sec. 1 of the Carriage of Goods by Sea Act, 46 U.S.C.A. 1301(c), provides: "The term 'goods' includes goods, wares, merchandise, and articles of every kind whatsoever, except live animals and cargo which by the contract of carriage is stated as being carried on deck and is so carried."

bill of lading with reference to the Act governing states: "except as may be otherwise specifically provided herein" (the bill of lading); such exception was made in the instant case by placing on the face of the bill of lading the terms "Loaded on Deck Owners Risk of Damage or Loss."

■■ A provision for carriage on deck at shipper's risk of damage or loss is proper.[20] A greater risk of loss to goods "on deck" has always been recognized.[21] Even as to goods below deck in the holds "perils of the sea" are specifically excepted by both the Harter Act[22] and the Carriage of Goods by Sea Act.[23] But here we are concerned with a cargo of dangerous goods properly carried on deck with the consent of the owner at shipper's risk of damage or loss. The term "shipped on deck at shipper's risk" has been discussed in numerous decisions and is an exemption clause long employed in maritime contracts.[24] It is conceded by Appellant, and correctly so, that even though a shipper assumes the risk of cargo damage by the elements "it would be liable for damage to the goods of the Libellant which were, under the proofs in the case, caused by the negligence of the Respondent."[25]

■ Of course the shipper accepted the risk of losses from carriage on deck only so far as they occurred under proper stowage. This is an element of seaworthiness[26] and proper dunnage is an element of proper stowage.[27] In The Idefjord, supra, bales of wool, goods particularly susceptible to damage by sea water wetting, were placed three feet above the deck on dunnage hatch covers and casks of orange peels, whereas there is nothing here to indicate, and Appellee does not contend, that cans of highly inflammable liquid could have been so placed. In fact such stowage has been held to constitute negligence.[28] As in the Idefjord case, supra, Appellant's witnesses testified that the cases were stowed in the customary manner and that it was good stowage. There was no evidence whatsoever to contradict this. The Appellant offered evidence of due diligence in caring for the cargo. Appellee offered no evidence whatsoever to show that the leakage and corrosion of cans was due to a want of diligence on the part of the carrier. The burden of proof under such circumstances is fully discussed by this Court in The Monte Iciar, 3 Cir., 167 F.2d 334, where it is pointed out that while exceptive provisions do not relieve a carrier from liability for negligence, the Libellant must adduce evidence to support such a finding of negligence.[29]

■ The sole negligence found by the court below was a failure to stow on dunnage of at least eight to ten inches in height since the seas washed the deck to a depth of two to seven inches. There was no evidence whatsoever to sustain such a finding. But the court also found that "It would not require much of a sea to wash water on deck * * * to a depth of 2–7 inches,"[30] and on the theory thereby adopted it would have been negligence to have had less dunnage than would have raised the cargo above any sea which might reasonably be expected to wash the deck

[20] A. J. Tower Co. v. Southern Pac. Co., 184 Mass. 472, 69 N.E. 348, Id., 195 Mass. 157, 80 N.E. 809.

[21] Davidson et al. v. Flood Bros., et al. (The Carriso), 9 Cir., 30 F.2d 279.

[22] Harter Act, Sec. 3, 46 U.S.C.A. § 192.

[23] Sec. 4(2) (c) of Carriage of Goods by Sea Act of 1936, 46 U.S.C.A. 1304 (2) (c); The Wildwood, 9 Cir., 133 F.2d 765, 771.

[24] The Idefjord, D.C., 31 F.Supp. 667, 671, reversed on other grounds, 2 Cir., 114 F.2d 262; Pioneer Import Corporation v. The Lafcomo, D.C.N.Y., 49 F. Supp. 559, 562, affirming 2 Cir., 138 F.2d 907, certiorari denied Black Diamond Lines v. Pioneer Import Corporation, 321 U.S. 766, 64 S.Ct. 523, 88 L.Ed. 1063.

[25] Appellant's brief, Page 6.

[26] Pioneer Import Corporation v. The Lafcomo, 2 Cir., 138 F.2d 907.

[27] The Indien, 9 Cir., 71 F.2d 752; 46 U.S.C.A. § 192, Harter Act, Sec. 3.

[28] The Otho, 1944 A.M.C. 1447; The Florinda, D.C., 22 F.2d 159; Lazarus v. Barber, D.C., 124 F. 1007, affirming 2 Cir., 136 F. 534; The C Lopez y Lopez, 2 Cir., 297 F. 457.

[29] See also Thomas Roberts & Co. v. Calmar S. S. Corporation, D.C.E.D.Pa., 59 F.Supp. 203, 210.

[30] Appendix 75a.

without rising to such violence as to be of a catastrophic nature.[31] Neither is such a finding consistent with the fact that six hundred ninety-nine of seven hundred seven cases were involved, which would necessarily include all three tiers of an approximate height of three feet. In the absence of any affirmative proof that it constituted negligence, and with the direct and uncontradicted testimony adduced by Appellant that the stowage was proper, the conclusion reached below is a mere speculation which, as we have indicated, might lead to absurd results. Appellee has not contended that there was any other negligence.[32]

We therefore find that the Appellee has failed to sustain the burden of proof incumbent upon it of establishing that the placing of this cargo on three inches of dunnage constituted negligence.

In view of our holding on this question, the other issue with respect to interest and costs need not be discussed.

The judgment will be reversed.

O'CONNELL, Circuit Judge (dissenting).

Rehearing of the instant appeal was had on the same day as the rehearing of The Monte Iciar, 3 Cir., 167 F.2d 334. As I indicated in the dissent filed in the Monte Iciar case, I believe that the carrier of goods by sea "has neither an inherent nor a statutory right, through the device of a statement like that on the bill of lading here in evidence, to assign to a shipper the responsibility for proving negligence." 167 F.2d 339. Even if the shipper does have that burden, I think the record in the instant case supports the judgment of the court below in favor of the shipper.

In admiralty cases, fact findings of the district court, when supported by competent evidence, are entitled to great weight and should not be set aside except under a showing that they are clearly wrong. The Mamei, 3 Cir., 1945, 152 F.2d 924, 926. The lower court found negligence in the stowage of the cargo involved, in that there was inadequate dunnage under the circumstances. In my opinion, this finding not only is supported by substantial evidence but is a quite reasonable conclusion.

The master of appellant testified that the vessel "was deep loaded and it would not take much of a sea to go over and get water on deck." While it is true, as pointed out in the majority opinion, that a flush deck ship may be loaded more deeply than more lightly constructed vessels; and while appellant was justified in stowing appellee's cargo on deck; it by no means follows that appellant was also justified in loading the cargo in such a manner that the cargo was likely to be exposed to corrosion by sea water. In weather which appears to have been neither unusual nor unexpected, the depth of water on deck from the waves ranged from two to six or seven inches, according to the testimony of the chief mate of appellant. It seems to me obvious that, under the circumstances, it was incumbent upon appellant to raise the cargo in question—whether by proper stowage on top of the hatches, by additional dunnage, or by any other acceptable means— so that the cargo would rest above the expected deck water level. The failure of appellant to exercise that degree of care, in my opinion, constitutes actionable negligence.

Moreover, while appellant did introduce testimony detailing the manner in which the shipper's cargo was stowed and covered, appellant did not explain why it was found desirable to add twelve rolls of tar paper covering after the two-day trip from Phil-

---

[31] Leeming in "Modern Ship Stowage," supra, Page 149 et seq., also points out that the vertical distribution of weight has a direct bearing on the stability of the ship.

[32] While there was oral testimony by the shipper as to the nature and quantity of goods shipped, and of one K. O. Van Leuven, a cargo surveyor and appraiser, as to the nature and extent of the damage, the only testimony on the method of stowage and the question of negligence was entirely by depositions. The rule applicable thereto is fully discussed in Crist v. United States War Shipping Administration, 3 Cir., 163 F.2d 145 (See also The Anaconda, 4 Cir., 164 F.2d 224; Sawyer v. McDonald et al., 5 Cir., 165 F.2d 426. In the present instance, however, we need not rely on this rule since we are unable to discover any evidence to justify the finding of the district court.

adelphia to Norfolk, as to which two days the record is silent. It is conceivable that the damage to the tin containers had occurred prior to arrival at Norfolk.

I believe that where, as here, this court rejects the lower court's findings of fact, it then becomes imperative upon this court, as one proceeding de novo, to consider the whole record. Crist v. United States War Shipping Administration, 3 Cir., 1947, 163 F.2d 145, 146, cited in the majority opinion. Assuming arguendo that the lower court's findings of fact as to the cause of damage were not supported by the evidence, can we dismiss this cause without a finding that the stowage of the cargo during the voyage from Philadelphia to Norfolk was sufficient under the circumstances, in the light of the action taken by the carrier at the latter port?

I am not prepared to say as a matter of fact that the carrier was free from negligence in the stowage of this cargo prior to its arrival at Norfolk, nor as a matter of law that the dunnage deemed necessary by the court below would not, under the circumstances, have efficiently prevented the damage which the cargo sustained.[1]

The reversal of the judgment of the court below by the majority of this court has rendered it unnecessary to consider the second question raised by appellant, whether it was proper to award interest to appellee. I do wish to state, however, that appellant's allegations concerning this question would have warranted attention. A delay of more than three years in bringing the libel to trial, which delay was at one point the basis for a motion to dismiss, is alleged to have been attributable solely to appellee. While the granting or denial of interest in admiralty cases normally rests within the sound discretion of the trial court, the aforementioned circumstances give reason for doubt whether such discretion was exercised wisely in the case at bar.

For the reasons stated, I believe that the judgment of the court below, exclusive of the award of interest, should be affirmed.

---

[1] The chief mate asserted that "the top layer of cases were in perfect shape, the same as we put them on."