**R. T. JONES LUMBER CO., Inc.**

v.

**ROEN S. S. CO.**

**THE HILDA.**
No. 11070.

United States Court of Appeals,
Seventh Circuit.
May 21, 1954.

Charles B. Quarles, Milwaukee, Wis., Laurence E. Coffey, Richards & Coffey, Buffalo, N. Y., for appellant.

Sparkman D. Foster, Detroit, Mich., John A. Kluwin, Henry J. Bendinger, Milwaukee, Wis., for appellees.

Before DUFFY, LINDLEY and SWAIM, Circuit Judges.

DUFFY, Circuit Judge.

Libelant, a New York corporation, brought this suit in admiralty, claiming to have been damaged because of the loss of 609,519 board feet of lumber which was being shipped to it on the barge "Hilda." The district court found the issues favorable to respondent and specifically found that the loss on November 25, 1950, of part of the cargo carried on the barge "Hilda" was due to "a peril of the sea."

The "Hilda," formerly Pere Marquette "Carferry 19," was converted to a barge in 1940. She is a vessel of 2,674 gross tons, built of steel, her keel length being 338 feet, her beam 56 feet. All cargo is transported on deck. During the conversion to a barge, engines and other equipment weighing 450 tons were removed from her hold; also all of the portions of the old carferry above the deck, excepting only the bridge, were likewise removed. A crane weighing some 200 tons was erected on the deck. From 1942 to 1950 respondent transported 34 cargoes of lumber for libelant, 28 of which were carried on the "Hilda."

On November 21, 1950, in excess of 2,000,000 feet of pine lumber was delivered to respondent at Blind River, Canada, to be carried by respondent from Blind River to North Tonawanda, New York, there to be delivered to libelant, as consignee. The lumber was loaded on the deck of the "Hilda" which in turn was towed by the tug "John Roen III," also owned by respondent. The lumber was loaded in the same manner as had been done on previous voyages. The cargoes for 1950 were transported pursuant to a letter by libelant to respondent which provided in part, "You will take the lumber from the docks at Blind River, placing same on our docks at North Tonawanda under the same methods and conditions as in the past. * * * This agreement between us is subject to * * * acts of God, and

other causes beyond the control of either party."

At about 7:00 a. m. on November 22, 1950, the "Hilda" departed the lumber company dock at Blind River, Canada, in tow of its tug. About 30 minutes later it was grounded on the east side of the channel, and was not released therefrom until 8:30 a. m. on November 24. After an inspection by a surveyor, who found the barge was not leaking, the tug and barge then proceeded through Mississagi Straits, and into Lake Huron, and southerly toward Port Huron, Michigan, which is located at the southerly or lower end of the lake. To reach the St. Clair River, the tug and barge had to travel about 213 miles on Lake Huron. The tug used a towline approximately 1,200 ft. in length.

As the tug and barge traveled southerly the wind was from the north, but no unusual sea or weather conditions were encountered until the early morning of November 25, at about the time the tug and barge passed Harbor Beach, Michigan, which is located about 60 miles north of Port Huron. At that time it was snowing heavily and static interfered with the ship-shore telephone system. When about 16 miles south of Harbor Beach, shortly before 8:00 a. m., the Captain of the tug received a storm warning. At that time the waves were running about 15 ft. high, and the wind from the north was increasing in intensity. Shortly thereafter the wind rapidly increased in velocity, blowing in excess of 50 miles per hour, and causing the barge to pitch and roll. The barge was rolling and pitching quite heavily by 9:00 a. m. and about 10:15 a. m., after the barge made an unusually violent pitch, causing it to roll heavily to starboard, a part of the cargo of lumber was dumped overboard. The barge then rolled to port and additional lumber went into the lake from the port side. The master ordered the engineer to place water in the ballast tanks on the starboard side, to correct the list caused by the loss of the lumber, and the tug and barge then proceeded to the St. Clair River without further incident, arriving at the Lake Huron Light Ship on November 25, 1950, at 12:26 p. m.

The testimony showed that rough weather on the Great Lakes can be expected in the month of November of any year, but the first mate of the tug testified that in all his experience on the Great Lakes he had never encountered a storm of the severity of the one encountered on November 25, 1950. He stated that the extraordinary thing about the storm was that it "came up all of a sudden." There were four other ships (two downbound with cargoes and two upbound running light) in the general area of where the "Hilda" lost part of her cargo of lumber, and officers from each of these four ships gave testimony describing the unusual weather and sea conditions.

The "Sylvania," downbound, laden with grain, had 11 ft. of freeboard, but solid masses of water came over her deck during the storm and crushed a steel hatch cover located amidship. The first mate of the "Sylvania" testified that only once before in his period of service on the Great Lakes had he experienced a wind of greater velocity.

The "William F. Stifel" was downbound, astern the tug and barge, and her master testified the velocity of the wind exceeded 50 miles per hour; that during his 42 years of sailing he had seen waves as high as during this storm on perhaps a half dozen occasions, but never had he experienced such seas on Lake Huron.

The master of the steamship, "S. T. Crapo," upbound, estimated the wind during the storm at from 50 to 60 miles per hour. He turned his ship about, and sought the shelter of the St. Clair River, as did the steamer, "Michael Gallagher."

The district court found, and such findings are not seriously disputed here, that the master of the tug used good judgment in proceeding directly ahead, in a southerly direction, in an endeavor to reach the St. Clair River, rather than to turn the tug and barge around in the

storm in an attempt to enter the artificial harbor at Harbor Beach.

■ The controlling question in this case is whether the loss of a part of the "Hilda's" cargo of lumber was a result of a "peril of the sea." If the storm encountered on Lake Huron by the "Hilda" on November 25, 1950, was no worse than was to be expected in view of the voyage and the season, there was no exoneration from liability for the loss. The Erskine M. Phelps, D.C., 231 F. 767; The Arakan, D.C., 11 F.2d 791; Franklin Fire Ins. Co. v. Royal Mail Steam Packet Co., 2 Cir., 58 F.2d 175. "A 'peril of the sea' is that danger that comes when wind and wave in their fury work their will with ship and cargo after the owner has used all reasonable effort to make the ship seaworthy and well qualified to withstand those hazards and perils that the owner knows or has reason to believe must be encountered." Norris Grain Co. v. Great Lakes Transit Corp. (The Chicago), 7 Cir., 70 F.2d 32, 33, 34.

In Philippine Sugar Centrals Agency v. Kokusai Kisen Kabushiki Kaisha, 2 Cir., 106 F.2d 32 at pages 34, 35, Judge Learned Hand expressed the rule as follows: "Although this was not a hurricane, it was bad enough to damage the gear and superstructure of a seaworthy ship. The phrase, 'perils of the sea', has at times been treated as though its meaning were esoteric: Judge Hough's vivid language in The Rosalia, 2 Cir., 264 F. 285, 288, has perhaps given currency to the notion. That meant nothing more, however, than that the weather encountered must be too much for a well-found vessel to withstand. Duche v. [Thomas & John] Brocklebank, 2 Cir., 40 F.2d 418. The standard of seaworthiness, like so many other legal standards, must always be uncertain, for the law cannot fix in advance those precautions in hull and gear which will be necessary to meet the manifold dangers of the sea."

■ Another definition appears in "The Giulia," 2 Cir., 218 F. 744, 746: "Perils of the seas are understood to mean those perils which are peculiar to the sea, and which are of an extraordinary nature or arise from irresistible force or overwhelming power, and which cannot be guarded against by the ordinary exertions of human skill and prudence." Hundreds of definitions might be cited, but to do so would serve no useful purpose. The duty of the court always is to determine whether the facts of a case bring the loss sustained within the exemption from liability encompassed by a valid and sound definition of "peril of the sea," such as hereinbefore quoted. The trial court found, "The loss of such cargo was due to a 'peril of the sea' as this term is commonly known and accepted." This is a question of fact. The Frey, 2 Cir., 106 F. 319; The Governor Powers, D.C., 243 F. 961.

■■ Although at times it has been stated, especially in the older cases, that on an appeal in admiralty there is a trial de novo, we pointed out in Koehler v. United States, 7 Cir., 187 F.2d 933, 936, that the findings of the district court will be accepted by the appellate court unless clearly against the preponderance of the evidence. Clearly, the facts in the case at bar disclose the "Hilda" did not encounter the usual kind of "bad Great Lakes storm" even for November, nor one that might have been expected in that month on Lake Huron. We think the court was justified in finding that the loss occurred by reason of a peril of the sea.

Decree affirmed.