**HARTFORD FIRE INSURANCE COM-PANY and Weyerhaeuser Company, Plaintiffs,**

v.

**CALMAR STEAMSHIP CORPORATION, SS PORTMAR and Jones Oregon Stevedore Company, Defendants.**

**HARTFORD FIRE INSURANCE COM-PANY and Weyerhaeuser Company, Plaintiffs,**

v.

**CALMAR STEAMSHIP CORPORATION, SS PORTMAR and Independent Stevedoring Company, Defendants.**

**Nos. 317–73C2, 599–73C2.**

United States District Court,
W. D. Washington,
Seattle Division.

Nov. 13, 1975.

David Danielson, Lane, Powell, Moss & Miller, Seattle, Wash., for plaintiffs.

David M. Salentine, Bogle & Gates, Seattle, Wash., for defendants Calmar and PORTMAR.

Dwight L. Guy, Detels, Draper & Marinkovich, Seattle, Wash., for defendants Jones and Independent.

## OPINION

BEEKS, Senior District Judge.

Two separate but similar losses of deck-stowed wood products generated these consolidated cases. Prior to each loss plaintiff Weyerhaeuser Company ("Weyerhaeuser") time chartered the M/S PORTMAR from its owner and operator, defendant Calmar Steamship Corporation ("Calmar"), for the intercoastal carriage of wood products from Coos Bay, Oregon, to various east coast ports. Plaintiff Hartford Fire Insurance Company is the insurer of the lost cargo in both instances, and its interest in these suits is derivative, arising out of its subrogation agreement with Weyerhaeuser. The stevedoring preceding each of the voyages was performed by defendants Jones Oregon Stevedoring Company ("Jones") and Independent Stevedore Company ("Independent"), respectively, each of whom was employed by Weyerhaeuser for that purpose.

The first loss (Cause No. 317–73C2) occurred off the Farallon Islands on April 29, 1972, at 1047 hours when the PORTMAR was approximately 23½ hours out of Coos Bay en route to the east coast via the Panama Canal. Said loss consisted of a quantity of lumber stowed on deck at #2 Hatch which was lost over the port side as certain chain lashings used to secure the deck cargo parted. This voyage will be referred to as "#1".

The second loss occurred off Bodega Head on March 11, 1973, at 1233 hours, an uncanny replication of the first loss. On this occasion the PORTMAR was about 22 hours out of Coos Bay when the deck lashings parted with the resulting immersion and loss over the port side

of a quantity of both lumber and plywood which had been stowed on deck at #2 and #3 Hatches. This voyage will be denoted "#2".

Plaintiffs seek to fix liability on Calmar and Jones with respect to the first loss and Calmar and Independent with respect to the second loss for the value of the lost cargo and the costs attending restowage after each loss. Calmar counterclaims for various particulars including the cost of repairs to the PORT-MAR necessitated by the two mishaps, for customs house brokerage fees incurred on #1, and for monies allegedly due and owing under the #1 charter. The obligations, performance and liabilities of each of the parties will be considered in turn.

### TIME CHARTER AGREEMENT

Weyerhaeuser and Calmar memorialized each charter agreement with a standard government time charter form incorporating numerous modifications reflecting the peculiar terms of their arrangement. Pertinent portions of said agreement follow:

.    .    .    .    .    .

2.    .    .    .

Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but owners to allow them the use of any dunnage and shifting boards already aboard vessel.

.    .    .    .    .    .

8. That the Captain shall prosecute his voyages with the utmost dispatch, and shall render all customary assistance with ship's crew and boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency; and Charterers are to load, stow, trim and discharge the cargo at their risk and expense under the supervision of the Captain, who is to sign Bills of Lading for cargo as presented, in conformity with Mate's or Tally Clerk's receipts.

.    .    .    .    .    .

24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels, etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both of which are to be included in all bills of lading issued hereunder:

#### U.S.A. Clause Paramount

This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

.    .    .    .    .    .

31. Vessel to supply deck lashings and slings for pre-slinging Lumber cargo, as on board, Charterer being responsible for return of same to Owner. Owner to return lashings and slings furnished by Charterer.

█ In construing and giving legal effect to this charter I hold that the parties agreed in clause 24 to have their respective rights and duties controlled by the Carriage of Goods By Sea Act[1] ("COGSA"), except insofar as they have expressly modified the COGSA scheme.

1. 46 U.S.C. §§ 1300 et seq.

Thus, the applicable COGSA provisions become a part of the parties' contract with the same force and effect as ordinary contract terms.[2]

The parties agreed to a significant departure from COGSA in clause 8 wherein Weyerhaeuser assumed full responsibility for the loading, stowing, trimming and discharge of the cargo, eschewing the incorporation of 46 U.S.C. § 1303(2). On the other hand, applicable and relevant COGSA provisions include Calmar's duty to exercise due diligence to provide a seaworthy and properly equipped ship[3] and the corresponding rules of liability and exoneration found in 46 U.S.C. § 1304. In addition, if unseaworthiness is found to be the cause of a loss, then COGSA places on Calmar the burden of proving its exercise of due diligence to provide a seaworthy vessel in order to avoid liability. Other charter provisions set forth above are self-explanatory and will be discussed as they become relevant.

## WEYERHAEUSER

Weyerhaeuser prepared the stowage plans for the subject voyages specifying the type and quantity of wood products to be stowed on deck and in the holds. Pursuant to the terms of the charter, the loading and securing of the cargo was done by Weyerhaeuser through its stevedores, Jones for #1 and Independent for #2.

2. *U. S. v. M/V Marilena P*, 433 F.2d 164 (4th Cir. 1969); *J. B. Effenson Co. v. Three Bays Corp. (The Church Bay)*, 238 F.2d 611 (5th Cir. 1956); Tetley, *Marine Cargo Claims* 5, 11–13 (1965). COGSA does not have statutory force and direct applicability here, because these charters were not for the carriage of goods "in foreign trade" within the meaning of 46 U.S.C. § 1300, and also because charter parties in which bills of lading are used merely as receipts are outside the compass of COGSA. 46 U.S.C. §§ 1300, 1301(b), 1305.

3. 46 U.S.C. § 1303(1).

4. The major problem attending simultaneous deck stowage of lumber and plywood is that the standard prepackaged plywood bundles differ in size from their counterpart lumber

It is Calmar's contention that the #1 deck stowage was negligent in that insufficient and unsuitable dunnage was employed, void spaces between loads were not adequately filled, so-called "corner irons" were not utilized to aid in the tightening of the chain lashings over the deck cargo, too few chain lashings restained the lumber, and other various deficiencies characterized this stow. With respect to #2 Calmar reiterates the above allegations and makes the added charge that the plan of stowage was negligent insofar as it called for the deck carriage of large quantities of both plywood and lumber which, Calmar contends, cannot be securely stowed together on deck.[4] The second loss included some of this deck-stowed plywood.

Initially, I find that Weyerhaeuser was not negligent in its decision to stow plywood on deck with lumber on #2. While it might be argued that this stowage plan was less than optimal to facilitate the loading and securing of the deck cargo, the evidence in this case does not establish such practice as unreasonably hazardous, conspicuously unwise, or improper in any respect. Weyerhaeuser had previously shipped smaller quantities of plywood in a plywood-lumber deck cargo mixture on Calmar vessels uneventfully. Moreover, the absence of vigorous dissent to this stowage plan by either Calmar or Independent prior to or during the loading of the PORTMAR for #2 further belies Calmar's contention.[5]

bundles making it more difficult to "tie" the whole deck load together by the use of dunnage between and across cargo tiers.

5. From the evidence before the Court it is clear that Calmar and Independent both had ample opportunity to consider and suggest changes in the deck stow arrangement adopted on # 2. Only Calmar's Portland Assistant Agent, Calvin G. Durham, testified to a communicated objection about the plywood deck stowage, and his recollection was too indistinct to merit any affirmative finding based on his testimony, particularly when considered in the light of his deposition testimony given at Cleveland, Ohio, on December 4, 1974. Testimony of Calvin G. Durham, Tr. Vol. III at 64–71.

Calmar's remaining claim of negligence in the physical implementation of the stow plan for both voyages necessitates evaluation of the stevedores' performance in loading and securing for the two voyages.[6]

## STEVEDORES

Weyerhaeuser and Calmar allege that negligent loading and securing of the deck cargo on the subject voyages proximately caused each loss. As between Calmar and Weyerhaeuser said stevedoring was Weyerhaeuser's responsibility under the charter. Jones and Independent undertook the actual loading and securing of the cargo for the respective voyages pursuant to their individual contracts with Weyerhaeuser. Consequently, if stevedore negligence was the proximate cause of either or both of the losses, the negligent stevedore would incur liability.[7]

■ I find, however, that such negligence has not been successfully demonstrated by a preponderance of the evidence which I credit and believe. Both stevedores loaded, stowed, dunnaged and lashed in a manner that, though possibly not perfect, was within the range of accepted deck stowage. I also note that all of said activity was witnessed and approved by qualified representatives of both Weyerhaeuser and Calmar.

■ Calmar's contractual duty in both cases was to exercise due diligence to furnish Weyerhaeuser with a seaworthy and properly equipped ship for the deck carriage of wood products. This duty extended to the chain deck lashings which Calmar agreed to furnish.[8]

■■ I am not persuaded that the unadorned phrase "as on board"[9] constituted an effective disclaimer, as contended by Calmar, and I hold that Calmar was obliged to exercise due diligence to provide lashings that were seaworthy and suitable for the securing of the Weyerhaeuser cargo. Calmar has cited no legal authority for its argued interpretation of said phrase, and I find it more reasonably indicative of an intent by Calmar to merely limit the quantity of lashings which it must supply to those physically present on the PORTMAR. Thus, if additional lashings or "extra lashings requisite for a special trade or unusual cargo"[10] were called for, Weyerhaeuser, and not Calmar, would be responsible to provide them. However, that limitation does not change Calmar's duty with respect to the lashings it *did* supply, and I find that Calmar lashings were in fact the only lashings used on the subject voyages. That conclusion is amply supported by the relevant testimonial and docu-

6. It does not now appear that Calmar seriously argues that Weyerhaeuser was negligent in its packaging and banding of its lumber and plywood for the two voyages and, lacking any substantive evidence to the contrary, I find that Weyerhaeuser was not so negligent.

7. Both stevedoring contracts contained provisions whereby the stevedore agreed to be financially responsible for cargo losses occasioned by its negligence.

8. Clause 31 of both charters as set out in this opinion, *supra*. The Court is cognizant of the fact that the bills of lading issued in connection with these voyages contained a provision stating "on deck at shipper's risk." These bills of lading were subject, however, to the charter (clause 40 of the charter) and were issued by Weyerhaeuser Line to Weyerhaeuser Company (the former being only a division of the latter rather than a separate entity) only as receipts for the cargo in Weyerhaeuser's hands. The terms of the bills of lading do not constitute an enforceable part of the parties' agreement under these circumstances. Even assuming arguendo that said provision was a part of the formal agreement, its effect would be limited to shifting to Weyerhaeuser the customary and predictable risks of deck carriage and would not protect Calmar from liability based solely on Calmar's negligence or failure to exercise due diligence to make the PORTMAR seaworthy. *Globe Solvents Co. v. The California*, 167 F.2d 859 (3rd Cir.), *cert. denied*, 335 U.S. 844, 69 S.Ct. 67, 93 L.Ed. 394 (1948).

9. Clause 31 of both charters as set out in this opinion, *supra*.

10. Clause 2 of both charters as set out in this opinion, *supra*.

mentary evidence.[11] I further find that both subject deck cargoes required no "extra fittings" as referred to in clause 2 of the charter agreement.

■ The chain lashings supplied by Calmar for both voyages were shown beyond question to be unseaworthy and unfit for the securing of these deck cargoes for the contemplated voyages,[12] and I hold that unseaworthiness was the sole proximate cause of the two losses in question.

Portions of the Calmar lashings actually used on the second voyage[13] and photographs of lashings used on both voyages[14] reveal even to the untrained eye substantial abuse and deterioration. The #2 lashings in evidence were pitted and rust-laden with obvious twists and deformities not present in new chain.

■ One of the photographs of #2 lashings[15] depicted a fractured "pelican hook"[16] with a prominent discoloration along the broken cross section, a telltale sign of a crack which pre-existed the loss and which would have been visible prior to the break upon a proper examination.[17] Photographic evidence in both cases clearly illustrated the sorry condition of the lashings immediately subsequent to the respective losses. They were replete with rust and featured distended, contorted chain links, which characteristics, I find, antedated said losses.[18] Metallurgical tests conducted on #2 chain lashings disclosed stock diameters significantly diminished from their original size (an original diameter of $7/8''$ reduced to $5/8''$ typically with isolated links as slender as $1/2''$),[19] typical tensile strengths of the links down 25% from their original strength,[20] measurable reductions in the ductility of the metal, and also a noticeable stretching and twisting thereof.[21]

In addition to the affirmative showing of deplorable deck lashing conditions, there is the totally unexplained disappearance of the entire collection of broken or distorted lashings involved in the first loss and some of the defective lashings involved in the second loss. Calmar personnel had custody and control of these lashings at and after each of the losses. Calmar also had a policy of retaining all defective gear and a procedure to accomplish this.[22] Under these circumstances, Calmar's failure to give any explanation for the non-production of said gear entitles this Court to infer, and I do so infer, that the missing lashings, if produced, would reveal defects and conditions adverse to Calmar.[23]

11. Deposition of Walter L. Snidow at 17; Deposition of Herbert J. Mohr at 63–64; Testimony of Joseph E. Bullock, Tr. Vol. III at 41; Exhibits A–3 and B–1 in Cause No. 317–73C2; Exhibits A–7 and B–1 in Cause No. 599–73C2.

12. A useful definition of unseaworthiness with continuing vitality is found in *Case of the Silvia*, 171 U.S. 462, 464, 19 S.Ct. 78, 43 L. Ed. 241 (1898), where the Court stated: "The test of seaworthiness is whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport." Calmar supplied lashings that were not fit to secure Weyerhaeuser cargo.

13. Exhibit 7 in Cause No. 599–73C2.

14. Exhibit 1 in Cause No. 599–73C2; Exhibits 1, 2, 15, A–2 in Cause No. 317–73C2.

15. Exhibit 2(a), photograph #5, in Cause No. 317–73C2.

16. A quick release unit here used to connect the turnbuckles to the chain lashings.

17. See Testimony of Richard E. Holt, Tr. Vol. II at 250–52; Deposition of Cyril S. Stewart at 96.

18. See Testimony of Richard E. Holt, Tr. Vol. II at 210–12, 214, 217–18, 240–41, 250–52.

19. *Id.* at 212–13.

20. *Id.* at 229–30. The results of the tensile strength test conducted by Calmar expert Joseph A. Butt cannot be accorded great weight due to his questionable testing methods. Testimony of Joseph A. Butt, Tr. Vol. III at 100–105; Testimony of Richard E. Holt, Tr. Vol. III at 130–33.

21. Testimony of Richard E. Holt, Tr. Vol. II at 217, 222, 239–40.

22. Testimony of Joseph E. Bullock, Tr. Vol. I at 15; Deposition of Arthur J. Eich at 23–24.

23. *M/V Hoparing*, 345 F.2d 451 (5th Cir. 1965); *Waterman Steamship Corp. v. Unit-*

■ Notwithstanding my finding of unseaworthiness, Calmar can yet escape liability under COGSA, as incorporated into the charter agreement, by proving its due diligence to provide and maintain a seaworthy vessel for these two voyages.[24] Calmar, though, has failed utterly in its efforts to make such showing with respect to either voyage. At the time of these two voyages Calmar had no formal procedures to adequately inspect or replace its deck lashing gear on a periodic basis so as to insure its strength and continuing serviceability.[25]

According to the evidence the only regular inspection of this gear was conducted by the chief mate on each voyage and consisted of visual examination plus an unscientific determination of deterioration due to oxidation made by striking suspected lashings with a hammer and noting the quantity of rust that was jarred loose.[26] No metallurgical tests were conducted on the Calmar lashings and, amazingly, Calmar has no record of the age of its lashings and, accordingly, no retirement plan for old lashings. Estimates of the age of the lashings produced at trial from #2 ranged as high as twenty years with respect to some portions.[27]

Periodic superficial inspection of the gear used on these voyages does not constitute due diligence to make the gear seaworthy.[28] Furthermore, even casual examination of the lashings involved should have raised enough concern to cause Calmar to either replace them or subject them to scientific evaluation. This was Calmar's responsibility, and Calmar must bear the consequences of its dereliction.

■ The effect of COGSA in the context of these charters is to place on Calmar the burden of bringing the losses in issue within one or more COGSA exemptions to liability once it is determined, as here, that the charterer has not been negligent in its packaging, delivery, loading and securing of the cargo.[29] The only COGSA exemption argued by Calmar in these consolidated cases is the exemption from liability with respect to losses caused by "perils of the sea."[30] Calmar does not come within said exemption in two equally fatal respects.

First, in order to avail itself of the COGSA exemptions Calmar must initially establish its due diligence to avoid the unseaworthy conditions that caused the loss.[31] This it has not done. Second, in neither case has Calmar demonstrated the existence of the singularly severe and tempestuous conditions of wind and water that characterize a "peril of the sea."[32] Calmar has presented no persuasive evidence that the wind forces or the accompanying seas attending each loss were extraordinary or unforeseeable for the times and locations of the losses.[33]

ed States Smelting, Refining and Mining Co., 155 F.2d 687 (5th Cir. 1946); Dow Chemical Co. v. S/S Giovanella D'Amico, 297 F. Supp. 699 (S.D.N.Y.1969).

24. 46 U.S.C. § 1304(1).

25. Deposition of Cyril S. Stewart at 25–31.

26. Id. at 27–28.

27. Testimony of Richard E. Holt, Tr. Vol. II at 248. Testimony reveals but one metallurgical test conducted on a few Calmar lashings in 1971, and the Court finds that said test did not concern lashings used on # 1 or # 2. The Court further takes note, with some surprise, of Calmar's purchasing used lashings on occasion, this notwithstanding its subsidiary relationship with Bethlehem Steel. Deposition of Arthur J. Eich at 12.

28. See Ore Steamship Corp. v. D/S Hassel, 137 F.2d 326, 329 (2nd Cir. 1943).

29. 46 U.S.C. § 1304.

30. 46 U.S.C.A. § 1304(2)(c).

31. 46 U.S.C. § 1304(1); Nichimen Co. v. M/V Farland, 462 F.2d 319, 330 (2nd Cir. 1972).

32. See, e. g., R. T. Jones Lumber Co. v. Roen S. S. Co., 213 F.2d 370, 373 (7th Cir. 1954); The Rosalia, 264 F. 285, 288 (2d Cir. 1920); The Frey, 106 F. 319 (2nd Cir. 1901); Longley, Common Carriage of Cargo § 13.03[4] (1967).

33. The respective deck logs show winds of force 6 and 7 on the Beaufort Scale at the time of the first loss and winds of force 4 and 5 at the time of the second loss.

## CONCLUSION

Accordingly, I find Calmar liable to plaintiffs for all damages proximately resulting from the unseaworthiness of the PORTMAR. Calmar's counterclaims for vessel damage in both cases and for customs brokerage fees and unpaid charter hire in #1 are denied and dismissed.

If the parties are unable to resolve the issue of damages within thirty (30) days from the date hereof, a Special Master will be appointed for the purpose of ascertaining plaintiffs' damages. The foregoing shall constitute the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). Counsel for Weyerhaeuser is directed to prepare and submit an Interlocutory Decree in conformance herewith.

The Clerk shall enter judgment of dismissal with prejudice and with costs of plaintiffs' causes of action against Jones and Independent.